UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

COLONY CAPITAL INC.,

        Plaintiff,

    -v-                                No.  21-CV-4645-LTS

JAMES F. FLAHERTY III,

        Defendant.

--------------------------------------------------------x

<u>MEMORANDUM ORDER</u>

        Plaintiff Colony Capital, Inc. ("Colony") moves pursuant to 9 U.S.C. section 10(a) to vacate an arbitration award issued on August 9, 2021 (docket entry no. 50 ("Amdursky Decl.") Ex. A (the "Award")) against Colony and in favor of defendant James F. Flaherty III ("Flaherty").  The Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. section 1332.  (See docket entry no. 62.)  The Court has considered the parties' submissions carefully, and, for the following reasons, the motion to vacate the Award is granted.

<u>BACKGROUND</u>

        In 2014, Flaherty, an individual with "significant expertise and experience as a senior executive in owning and operating healthcare related assets," and Colony's predecessor, a firm with investments in healthcare-related assets, entered into a "Limited Partnership Agreement of Healthcare Opportunity JV, LP" (docket entry no. 10-1 ("Partnership Ag.")) in

order to assist in the management and growth of those assets.  (Id. at 1.)[1]  The Partnership

Agreement contemplated that Colony would open an office in Los Angeles, California, and that

Flaherty would have the right to use part of that office in connection with the services performed

by the Partnership.  (Id. § 4.2.)

        The Partnership Agreement provided that no Partner would be responsible "for

any indebtedness or obligation of the Partnership or any other Partner . . . . except as to those

responsibilities, liabilities, indebtedness or obligations incurred pursuant to, and as limited by,

the terms of [the] Agreement."  (Partnership Ag. § 1.5.)  The Agreement further provided that,

with certain enumerated exceptions, "the debts, obligations and liabilities of the Partnership,

whether arising in contract, tort, or otherwise, shall be the debts, obligations and liabilities solely

of the Partnership, and no Partner shall be obligated personally for any such debt, obligation, or

liability of the Partnership solely by reason of being a partner of the Partnership."  (Id. § 5.2.)

        As relevant here, the Partnership Agreement contained both an indemnification

provision and a venue provision.  The indemnification provision provided that:

> The Partnership shall indemnify and hold harmless the Partners and their
> respective members, partners and/or their respective officers, directors,
> employees, agents, principals and Affiliates (individually, an
> "Indemnitee"), including, without limitation, members of the Executive
> Committee and the Managing Director, from and against any and all
> losses, claims, demands, costs, damages, liabilities, expenses of any nature
> (including reasonable attorneys' fees and disbursements), judgments,
> fines, settlements and other amounts arising from any and all claims,
> demands, actions, suits or proceedings in which the Indemnitee may be
> involved, or threatened to be involved, as a party or otherwise, arising out
> of or incidental to the business of the Partnership (excluding liabilities to
> any Partner (or its Affiliates) in connection with disputes between Partners
> or their Affiliates for breach of this Agreement or other matters),
> regardless of whether the Indemnitee continues to be a Partner, or a

---

[1]    Neither party argues that the change in Colony's corporate form over time has any
bearing on the merits of its motion to vacate.  For purposes of this Memorandum Order,
therefore, "Colony" refers to Colony Capital, Inc., and its predecessors.

> member, partner, Affiliate, officer, director, employee, agent, principal or
> affiliate as aforesaid at the time any such liability or expense is paid or
> incurred [except in certain circumstances not relevant here] . . . .

(Partnership Ag. ¶ 7.6(a) (emphasis added).)  The venue provision provided that "the parties

hereby irrevocably submit to the exclusive jurisdiction of any New York state or federal court

sitting in New York County over any suit, action or proceeding arising out of or relating to this

agreement."  (Id. § 12.9 (emphasis added); see also id. ("Section 12.9 shall survive . . . the

termination of this agreement.").)  The Partnership Agreement further provided that it constituted

the entire agreement between the parties "with respect to the subject matter hereof."  (Id. §§ 12.1,

12.3.)

        In or around April of 2014, Colony hired Meiko Dixon to serve as Flaherty's

Executive Assistant.  On February 9, 2017, Colony and Dixon entered into a "Mutual Agreement

to Arbitrate Claims" (docket entry no. 10-2 ("Dixon Arb. Ag.")), pursuant to which Colony and

Dixon "elect[ed] to resolve their disputes by binding arbitration."  (Id. at 1.)  They "mutually

consent[ed] to the resolution by arbitration of any and all claims, disputes, or controversies

arising out of or related to Employee's . . . employment," including, for example, "[c]laims for

discrimination, harassment or retaliation" and claims "that Employee may have against any of

the following (1) the Company, (2) its officers, directors, employees or agents in their capacity as

such or otherwise, [and/or] (3) the Company's parent, subsidiary, predecessor, and affiliated

entities . . ."  (Id. at 1.)  The arbitration agreement governed the timeline on which "the aggrieved

party must give written notice of any claim to the other party," provided that "the party who did

not initiate the claim" would determine whether the arbitration would be held under the auspices

of either the "American Arbitration Association ('AAA') or Judicial Arbitration & Mediation

Services ('JAMS')," and stated that Colony would pay any fees and costs of the Arbitrator,

except that if "Employee is the party initiating the claim, Employee will contribute an amount equal to the filing fee to initiate a claim in the court of general jurisdiction in the state in which Employee is (or was last) employed[.]"  (Id. at 3-4.)  The arbitration agreement provided that it was governed by the Federal Arbitration Act ("FAA"), 9 U.S.C. section 1 et seq.  (Id. at 4.)

The joint venture created pursuant to the Partnership Agreement terminated in September of 2017.  (Award at 4.)  Dixon's employment with Colony continued until the end of that year.  (Id.)  In early December 2017—approximately one week after "there was a Press Release as to a substantial contribution made by Mr. Flaherty and his spouse to the University of Notre Dame"—Dixon sent Flaherty two emails "with allegations of sexual harassment and retaliation on Mr. Flaherty's part."  (Id.)  Both Colony and Flaherty retained counsel, and Colony performed an investigation of the allegations.  (Id.)  In or before February 2018, Colony entered into a severance agreement with Dixon in which she received $100,000 and released all claims against Colony—but not against Flaherty.  (Id. at 5.)

Through arbitration demands dated January 7 and 24, 2019, Flaherty instituted a JAMS arbitration, naming as respondents both Dixon and Colony Capital.  (Kennedy Decl. (docket entry no. 59-1) Exs. B & C.)  Flaherty alleged that Dixon had agreed to arbitrate her harassment and retaliation claims as against Flaherty through her arbitration agreement with Colony.  (Id. Ex. B.)  He further alleged, in his arbitration demands, that "pursuant to Flaherty's limited partnership agreement, [Colony] must indemnify and defend Flaherty in this action" (id.), and that Colony had thus far "refused to comply with its [indemnification] obligations as required by, inter alia, Flaherty's limited partnership."  (Id. Ex. C.)

Colony promptly objected to Flaherty's effort to arbitrate his indemnification claim against Colony—on the ground that Flaherty and Colony "did not agree to arbitrate

disputes arising out of the JV agreement," instead agreeing to litigate such disputes in the exclusive venue of the state and federal courts of New York—and notified JAMS that Colony "[did] not intend to participate in the arbitration" given that JAMS had no jurisdiction over it, either to decide the merits of Flaherty's indemnification claim or to decide the arbitrability of that claim.  (Docket entry no. 50-1 at ECF pages 19, 48-49, 248-59; see also id. at ECF pages 51-54 (February 6, 2019, letter in which Colony wrote to JAMS that Colony "is not a proper party to this arbitration" and "will not participate [ ] unless and until it is ordered to do so by a court").)  Notwithstanding a section of the Dixon-Colony arbitration agreement providing that "[e]ither party may bring an action in any court of competent jurisdiction to compel arbitration under this Agreement" (Dixon Arb. Ag. at 4), Flaherty did not at that or any other point file such an action.

On May 13, 2020, the arbitrator held a preliminary scheduling conference. Counsel for Flaherty and Dixon appeared; Colony did not.  (Docket entry no. 59-1 at ECF pages 251-55.)  The arbitrator scheduled a final status call for May 4, 2021, and a five-day arbitration hearing for June 14-18, 2021.  (Id.)[2]  Colony continued to object to its inclusion in the arbitration proceeding.  (Docket entry no. 50-1 at ECF pages 248-49.)

In July 2020, Flaherty and Dixon entered into an agreement whereby "Ms. Dixon would release her claims against Mr. Flaherty in exchange for a waiver of costs and that Mr. Flaherty would release any claim for alleged Malicious Prosecution."  (Award at 5.)

On April 26, 2021, the arbitrator issued an order stating that "[a]t present it appears that the matter will go by way of a prove up," and scheduled the arbitration of Flaherty's

---

[2]     Dixon's arbitration agreement provided that "[s]hould any party refuse or neglect to appear for, or participate in, the arbitration hearing, the Arbitrator shall have the authority to decide the dispute based upon whatever evidence is presented."  (Dixon Arb. Ag. at 3.)

indemnification claim against Colony to occur on June 14, 2021.  (Docket entry no. 59-1 at ECF page 256.)

On May 24, 2021—three weeks before the scheduled arbitration hearing—Colony filed this action seeking injunctive relief (in the form of a stay of an arbitration between the parties) and declaratory relief (in the form of a judgment that the underlying indemnification dispute between the parties is not arbitrable and that Flaherty is not entitled to indemnification from Colony).  The Honorable Alison J. Nathan, who initially presided over this action, ordered expedited briefing on Colony's request for injunctive relief and scheduled oral argument for June 11, 2021.  (See docket entry nos. 12, 16.)  On that date, Judge Nathan heard the parties' arguments and denied Colony's request for a preliminary injunction staying the June 14 arbitration hearing, principally on the ground that Colony's delay in seeking injunctive relief "cut[ ] sharply" against a finding of irreparable harm and "shift[ed] the balance of equities decisively against it."  (Docket entry no. 29-1 at 29:20-37:17.)[3]

The arbitration proceeding was held on June 14, 2021.  Colony appeared specially through counsel in order to restate Colony's position that there was no "valid contract to arbitrate" and to ask for a continuance, in order to allow Colony either to continue to pursue its arbitrability arguments in this Court (and/or the Second Circuit), or to appear specially and submit a brief to the arbitrator as to jurisdiction and arbitrability.  (Amdursky Decl. Ex. B at 37:18-23, 63:13-25.)  The arbitrator denied that request and proceeded to hear Flaherty's

---

[3]    Judge Nathan also concluded, "[w]ithout deciding these gateway questions," that Colony had not demonstrated that it was "likely to succeed on its argument" that Flaherty's indemnification claim fell "outside the arbitrator's jurisdiction," noting that Colony had shown at most "some questions as to the merits of its claims and the balance of hardships does not tip decidedly in its favor."  (Docket entry no. 29-1 at 37:5-10; see also id. ("Arbitrability in this case poses difficult questions ill suited to resolution on a limited preliminary injunction record.").)

evidence, which consisted primarily of Flaherty's own testimony, without Colony's

participation.

During his testimony, Flaherty explained the genesis of his relationship with

Colony and with Dixon.  As relevant here, he testified that "per the terms" of the Partnership

Agreement, Colony was "obligated . . . to hire as an employee an executive assistant," i.e., Ms.

Dixon.  (Docket entry no. 59-1 at ECF pages 783-84; id. at ECF page 782 ("[T]hey were also

required by the terms of the joint venture to provide me with an executive assistant.").)  He also

testified as to Colony's purported "contractual obligations to indemnify" him in connection with

his defense of Dixon's claims against him.  (Id. at ECF page 802; see also id. at ECF page 835

(testifying that, after the July 2020 resolution between Flaherty and Dixon, "it came time to turn

our attention to have [Colony] provide the contractual indemnification that they had agreed to

back in 2014").)

On July 23, 2021, Flaherty submitted a Closing Brief to JAMS.  (Amdursky Decl.

Ex. C ("Closing Brief").)  In his Closing Brief, Flaherty did not argue that he was entitled to

indemnification from Colony by virtue of his Partnership Agreement with Colony, but rather

argued that he had a right to indemnification based on his status as Colony's agent, pursuant to a

California statute, and on equitable grounds.  (Id. at 16-19.)

On August 9, 2021, the arbitrator issued the Award in favor of Flaherty in the

amount of $491,142.  (Award at 12.)  In the Award, the arbitrator determined that Flaherty was

entitled to indemnification against Colony under California Corporations Code section 317(d), a

subsection which Flaherty had not referenced in his submissions and which provides for

mandatory indemnification of a corporate agent only where the agent is "successful on the merits

in defense of any proceeding" described in paragraphs (b) or (c) of that section.  (Id. at 6-7.)  The

arbitrator further found that Flaherty's indemnification claim against Colony was arbitrable

under Dixon's arbitration agreement with Colony, by virtue of Flaherty's status as an agent of

Colony, and because his claim for indemnification against Colony was "inextricably intertwined"

with the merits of Dixon's claim against him because he could not receive indemnification under

section 317(d) without having been "successful on the merits" in his defense of Dixon's claim.

(Id. at 8-10.)

On October 1, 2021, Colony filed its motion to vacate the Award, arguing that

that the question of arbitrability was for the Court, not the arbitrator, to resolve; that Flaherty's

indemnification claim was not arbitrable; and that the arbitrator exceeded his powers, manifestly

disregarded the law, and denied Colony fundamental fairness during the arbitral proceedings.

<u>DISCUSSION</u>

Colony's principal argument is that the Award must be vacated because Colony

never agreed to arbitrate Flaherty's indemnification claim.  The Court agrees.

"Arbitration is a creature of contract; a party therefore cannot be required to

submit to arbitration any dispute which it has not agreed to submit."  Doe v. Trump Corp., 6

F.4th 400, 412 (2d Cir. 2021).  "It is black letter law that an obligation to arbitrate can be based

only on consent. . . . It is essentially only by making a commitment to arbitrate that one gives up

the right of access to a court of law in favor of arbitration."  Sokol Holdings, Inc. v. BMB Munai,

Inc., 542 F.3d 354, 358 (2d Cir. 2008).  This question of whether an "agreement exists" is for the

Court to decide with reference to ordinary rules of contract formation.  Granite Rock Co. v. Int'l

Bhd. of Teamsters, 561 U.S. 287, 297-303 (2010); Barrows v. Brinker Rest. Corp., 36 F.4th 45,

50 (2d Cir. 2022) (on the "antecedent question of whether the parties actually agreed to

arbitration (that is, whether an arbitration agreement between them exists at all)," courts "resolve

such agreement-formation questions as [they] would most any contract dispute: by applying the law of the state at issue.").[4]

In this case, Colony and Flaherty never entered into any agreement to arbitrate Flaherty's indemnification claim or any other, and the only agreement between them—the Partnership Agreement—provides for litigation, rather than arbitration, of disputes arising under it.  The Court therefore concludes that no agreement to arbitrate exists between the parties.

In some circumstances, however, the Second Circuit has compelled a signatory to an arbitration agreement to arbitrate "disputes relating to that contract although the dispute was with an entity which was not a signatory to the arbitration contract."  Sokol, 542 F.3d at 358.  It has done so under "an alternative estoppel theory" whereby a signatory may be estopped from refusing to arbitrate based on "the relationships of persons, wrongs and issues, in particular whether the claims that the nonsignatory sought to arbitrate were intimately founded in and intertwined with the underlying contract obligations."  Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co., 271 F.3d 403, 406 (2d Cir. 2001) (citations and internal quotation marks omitted).  See also id. ("In [Thomson-CSF, S.A. v. Am. Arb. Ass'n, 64 F.3d 773, 776-79 (2d Cir. 1995)], this Court classified five theories, including estoppel, under which a signatory can

---

[4]    Traditional principles of state contract law also control whether a litigant who is not a party to an arbitration agreement may invoke arbitration.  Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009).  Flaherty does not address which state's law the Court should apply to resolve these issues, although both he and Colony apply case law from the Second Circuit.  Neither party suggests any substantive difference on these points between the laws of California (the law applying under the Dixon arbitration agreement), Delaware (the law applying under the Partnership Agreement), and New York (where this Court sits).  See also Contec Corp. v. Remote Sol., Co., 398 F.3d 205, 208 n.1 (2d Cir. 2005); Mundi v. Union Sec. Life Ins. Co., 555 F.3d 1042, 1046 (9th Cir. 2009) (citing approvingly to Second Circuit law); In re Henson, 869 F.3d 1052, 1060 (9th Cir. 2017) ("Turn concedes, and we agree, that there is no material difference between New York and California's equitable estoppel laws.").

compel a non-signatory to arbitrate—none of them applicable here because among other things in this case it is the non-signatory that seeks to invoke the arbitration clause.").  Stated otherwise:

> A signatory to an arbitration clause is estopped from refusing to arbitrate against a non-signatory where (1) 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed' and (2) there is 'a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute' with the non-signatory.

Doe v. Trump Corp., 453 F. Supp. 3d 634, 640 (S.D.N.Y. 2020) (quoting Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 127 (2d Cir. 2010)), aff'd, 6 F.4th 400 (2d Cir. 2021).  The Court addresses each of these elements in turn.

Intertwinedness

The Court first considers "whether the claims that [Flaherty] sought to arbitrate were intimately founded in and intertwined with the underlying contract obligations" between Dixon and Colony.  Doe, 6 F.4th at 412 (quoting Choctaw, 271 F.3d at 406).  Accord Aliff v. Vervent, Inc., No. 20-CV-00697-DMS-AHG, 2020 WL 5709197, at *10 (S.D. Cal. Sept. 24, 2020) (applying California law and considering whether claims were "intimately intertwined" with arbitration agreement), aff'd, No. 20-56121, 2021 WL 5985584 (9th Cir. Dec. 17, 2021). "Claims are intertwined 'where the merits of an issue between the parties [i]s bound up with a contract binding one party and containing an arbitration clause.'"  Denney v. Jenkens & Gilchrist, 412 F. Supp. 2d 293, 298 (S.D.N.Y. 2005) (citation omitted).

In this case, Flaherty's indemnification claim was not intimately founded in and intertwined with any underlying obligation in the Dixon-Colony arbitration agreement. Flaherty's indemnification claim (whatever its legal basis) arose from his defense of Dixon's assertion of harassment and retaliation claims against him; it does not rely on either the existence

of Dixon's arbitration agreement or the interpretation of any provision thereof.  This

distinguishes this case from those in which claims have been found sufficiently intertwined to

warrant an estoppel finding.  See Denney, 412 F. Supp. 2d at 298-99 ("Although the Second

Circuit has not expressly adopted this rule, when the Second Circuit has found a plaintiff

estopped from avoiding arbitration, the plaintiff's claims depended in substantial part on the

existence of an agreement that contained an arbitration clause."); Holzer v. Mondadori, No. 12-

CV-5234-NRB, 2013 WL 1104269, at *13 (S.D.N.Y. Mar. 14, 2013) ("resolution of plaintiffs'

claims against Mondadori does not rely upon, and therefore does not require interpretation of, the

terms of the Purchase Agreements"); DMS Servs., LLC v. Superior Ct., 205 Cal. App. 4th 1346,

1355, 140 Cal. Rptr. 3d 896, 903 (2012) (non-signatory's claim found not to be "inextricably

intertwined" where it was not based on a breach of or any provision of the agreement containing

an arbitration clause).  Cf. Astra Oil Co. v. Rover Navigation, Ltd., 344 F.3d 276, 280 (2d Cir.

2003) (directing grant of petition to compel arbitration in part because the non-signatory's claims

were "brought directly under the [agreement containing an arbitration clause] signed by" the two

signatory parties).

      The arbitrator found that Flaherty's indemnification claim was "inextricably

intertwined" with Dixon's arbitration agreement because, under section 317(d) of the California

Corporations Code, "as an agent [Flaherty] would not be able to seek reimbursement had he not

been 'successful on the merits in defense of the proceeding.'"  (Award at 9-10 (quoting Cal.

Corp. Code § 317(d)).)  However, Flaherty's alleged success on the merits as against Dixon did

not depend on any provision of Dixon's arbitration agreement with Colony, or even on any

aspect of Dixon's broader employment relationship with Colony.  The mere fact that Flaherty's

indemnification claim stems from his defense of a claim that may have been arbitrable under Dixon's employment agreement does not render those claims inextricably intertwined.

Indeed, even the California state court decision relied on by the arbitrator to support his arbitrability finding (see Award at 9-10) distinguished between a claim which merely results from a precursor action and one which is "founded in and intertwined with [an] agreement containing [an] arbitration clause":

> A standard indemnity claim, for example, does not exist but for the precursor action giving rise to it. Nevertheless, in those circumstances, the doctrine of equitable estoppel does not bind nonsignatory indemnitors to an arbitration agreement between the parties to the underlying action when, as here, the indemnity claims are not founded in the contract containing the arbitration provision and there is no preexisting relationship between the defendants on which to base an estoppel.

DMS, 205 Cal. App. 4th at 1357, 140 Cal. Rptr. 3d at 904.  See also id. ("The question is not whether the actions are related . . . commonality of issues is a far cry from claims grounded in, and 'inextricably intertwined with,' the arbitration agreement.").

Relationship Among the Parties

Furthermore, the "relationship among the parties" is not "of a nature that justifies a conclusion that the party which agreed to arbitrate [Colony] with another entity [Dixon] should be estopped from denying an obligation to arbitrate a similar dispute with the non-signatory [Flaherty]."  Doe, 453 F. Supp. 3d at 640 (citation and internal quotation marks omitted).

"In Choctaw, [the Second Circuit] summarized the [factors relevant to this relational analysis] as 'the relationship among the parties, the contracts they signed (or did not), and the issues that ha[ve] arisen.'"  Contec, 398 F.3d at 209 (citations omitted).  This threshold analysis is for the Court, rather than the arbitrator, to conduct.  Id.; Gerszberg v. Li & Fung (Trading) Ltd., 215 F. Supp. 3d 282, 285 (S.D.N.Y. 2016) ("this threshold question is for the

Court to decide"); Holzer, 2013 WL 1104269, at *7-10 (same).  It does not warrant a finding of estoppel here.

First, the nature of the relationships among Flaherty, Dixon, and Colony does not support such a finding.  As summarized by the Second Circuit in its Sokol decision, the principal focus of this analysis is on the relationship between the non-signatory (in this case, Flaherty) and the signatory in whose shoes he seeks to stand in invoking an agreement to arbitrate (Dixon):

> In each case [finding arbitrability], the promise to arbitrate by $x$, the entity opposing arbitration, was reasonably seen on the basis of the relationships among the parties as extending not only to $y$, its contractual counterparty, but also to $y^{\,l}$, an entity that was, or would predictably become, with $x$'s knowledge and consent, affiliated or associated with $y$ in such a manner as to make it unfair to allow $x$ to avoid its commitment to arbitrate on the ground that $y^{\,l}$ was not the very entity with which $x$ had a contract.

Sokol, 542 F.3d at 361; id. at 361-62 ("The cases, in other words, are consistent with the black letter rule that the obligation to arbitrate depends on consent. They simply extend its contours somewhat by establishing that the consent need not always be expressed in a formal contract made with the party demanding arbitration.").  Accord Holzer, 2013 WL 1104269, at *14 ("this inquiry looks primarily to the relationship between the non-signatory seeking to compel arbitration and the signatory in whose shoes the non-signatory seeks to stand") (collecting cases); Medidata Sols., Inc. v. Veeva Sys. Inc., 748 F. App'x 363, 366 (2d Cir. 2018) (affirming denial of motion to compel arbitration where the party seeking to compel arbitration had not shown that the party refusing arbitration "treated the signatory and non-signatory corporate affiliates as at least somewhat interchangeable").

For example, in Contec, the Second Circuit permitted a non-signatory successor corporation to invoke its signatory predecessor's arbitration agreement with another signatory where "the parties apparently continued to conduct themselves as subject to the 1999 Agreement

[containing an arbitration clause] regardless of change in corporate form."  Contec, 398 F.3d at 207-10.  In such a case, "[i]t makes rather obvious sense to prevent an entity from avoiding its obligation to arbitrate a dispute simply by morphing into another entity."  Doe, 6 F.4th at 413; accord Republic of Iraq v. ABB AG, 769 F. Supp. 2d 605, 611 (S.D.N.Y. 2011) (rejecting a non-signatory's effort to invoke an agreement to arbitrate arbitrability as against a signatory to such an agreement where the non-signatory was "not a corporate successor to the [other signatory] United Nations nor does it otherwise stand in the United Nations' shoes"), aff'd sub nom. The Republic of Iraq v. BNP Paribas USA, 472 F. App'x 11, 13 (2d Cir. 2012) ("Two facts informed that conclusion [in Contec]: (1) the 'undisputed relationship between each corporate form of Contec and Remote Solution' and (2) the parties['] continued conduct of themselves as subject to the agreement regardless of change in corporate form." (quoting Contec, 398 F.3d at 209)).[5]

       In contrast to relationships among the parties in those cases discussed above, here Dixon's relevant relationship with Colony (that of an employee claiming to have been wronged

---

[5]      None of the original parties to the arbitration in this case appears to have objected to Flaherty's invocation of Dixon's arbitration agreement with Colony in order to stand in the shoes of his joint venture partner Colony and compel arbitration of Dixon's claims as against Flaherty—a circumstance more analogous to the cases relied on by Flaherty in the Closing Brief he submitted to the arbitrator.  Indeed, Dixon's agreement with Colony specifically provided for arbitration of claims by Dixon against Colony's "officers, directors, employees or agents in their capacity as such or otherwise."  (Dixon Arb. Ag. at 1.)  See Garcia v. Pexco, LLC, 11 Cal. App. 5th 782, 787, 217 Cal. Rptr. 3d 793, 796 (2017) ("Garcia agreed to arbitrate his wage and hour claims against his employer, and Garcia alleges Pexco and Real Time were his joint employers. Because the arbitration agreement controls Garcia's employment, he is equitably estopped from refusing to arbitrate his claims with Pexco."); Ronay Fam. Ltd. P'ship v. Tweed, 216 Cal. App. 4th 830, 157 Cal. Rptr. 3d 680 (2013) (permitting arbitration of investor's claims against financial advisor who served as agent of investment offeror with whom the investor had agreed to arbitrate such claims).  But see Soto v. O.C. Commc'ns, Inc., No. 17-CV-00251-VC, 2018 WL 10534324, at *2 n.1 (N.D. Cal. Nov. 21, 2018) ("Garcia's interpretation of the equitable estoppel exception may be inconsistent with traditional notions of equitable estoppel and other California Court of Appeal cases.").

by Colony or its agent in the course of her employment relationship with the company) is
different from Flaherty's relevant relationship with Colony (whether viewed as an agency or
joint venture relationship) because, in the context of the dispute in which the arbitration
agreement was invoked, Flaherty's position was adverse to both Dixon (who had accused him of
wrongdoing) and Colony (which he claims is obligated to indemnify him, which claim Colony
disputes).  Colony thus did not treat Flaherty and Dixon as interchangeable, and Flaherty cannot
be said to stand in the shoes of Dixon in invoking her arbitration agreement against Colony.

     Second, the contracts the parties signed compel the same conclusion.  To be sure,
Ms. Dixon's agreement with Colony contained an arbitration clause which was broad in some
respects, providing that "[t]he Company and Employee mutually consent to the resolution by
arbitration of any and all claims . . . arising out of or relating to Employee's . . . employment,"
and that such claims include claims for "harassment" as well as other claims "whether or not
arising out of Employee's employment" that "Employee may have against" any of Colony, its
"officers, directors, employees or agents," or its "affiliated entities," among others, but is clearly
focused on claims asserted by one of the parties to that agreement.  (Dixon Arb. Ag. at 1
(emphasis supplied).)  The agreement speaks of Colony and Dixon resolving "their disputes"
(id.), provides the timeline in which "[t]he Company and Employee agree that the aggrieved
party must give written notice of any claim to the other party," and allows "the party who did not
initiate the claim" to designate whether "[t]he arbitration will be held under the auspices of"
either the AAA or JAMS.  (Id. at 2-3.)  The agreement's fee structure also contemplated either
Dixon or Colony asserting a claim, providing that "[t]he Company will be responsible for paying
any filing fee and the fees and costs of the Arbitrator; provided, however, that if Employee is the
party initiating the claim, Employee will contribute an amount equal to the filing fee to initiate a

claim in the court of general jurisdiction in the state in which Employee is (or was last) employed by the Company." (Id. at 4.)  The agreement does not reference any claims brought by non-parties for indemnification or otherwise.[6]  Dixon and Colony's agreement to arbitrate "their disputes" does not reflect Colony's agreement to arbitrate its disputes with other parties.  See Republic of Iraq, 472 F. App'x at 13 ("evidence of intent to have an arbitrator determine its jurisdiction with regard to disputes 'referred by either Party,' J.A. 339, does not clearly and unmistakably demonstrate their intent to have the arbitrator determine its jurisdiction with respect to any dispute raised by a non-party").

Even if Dixon's arbitration agreement could be considered ambiguous on this point, the Partnership Agreement actually signed by Colony and Flaherty is highly relevant to the determination of whether Colony agreed to arbitrate disputes between it and Flaherty that related to conduct in connection with the joint venture.  That agreement did not include any arbitration provision but, rather, included a venue provision wherein the parties submitted to the "exclusive jurisdiction" of New York state and federal courts "over any suit, action, or proceeding arising out of or relating to this agreement." (Partnership Ag. § 12.9.)  Colony's agreement with Flaherty to litigate rather than arbitrate disputes arising from the Partnership Agreement (which, as discussed below, include those claims as to which Flaherty demanded arbitration) weighs against a finding that the parties to the dispute over Flaherty's indemnification claim intended to require arbitration of that claim.

Third, the issues that have arisen between Flaherty and Colony similarly weigh against any such finding.  Flaherty's demands for arbitration expressly sought indemnification

---

[6]      Indeed, the only claims involving third parties mentioned in the agreement are those "Employee may have" against enumerated affiliates of Colony.  (Dixon Arb. Ag. at 1 (emphasis added).)

for his defense of Dixon's claims under the terms of the parties' Partnership Agreement. (Docket entry no. 59-1 at ECF pages 32 ("pursuant to Flaherty's limited partnership agreement, Colony [ ] must indemnify and defend Flaherty in this action") & 52 ("Colony refused to comply with its [indemnification] obligations as required by, inter alia, Flaherty's limited partnership").) Flaherty had specifically agreed, in that Partnership Agreement, to submit such claims to the exclusive venue of the state and federal courts of New York.  Although Flaherty later sought indemnification under alternative theories, as late as during the arbitration hearing itself Flaherty testified that he was entitled to indemnification under the terms of the Partnership Agreement. (See docket entry no. 59-1 at ECF pages 802 & 835.)  Notwithstanding the later evolution of Flaherty's legal theory, the indemnification claim in his arbitration demands fell squarely within the parameters of his Partnership Agreement with Colony and therefore cannot be said to be one that Colony and Flaherty agreed to arbitrate.[7]

In short, the relationship among the parties does not warrant a finding that Colony consented to Flaherty's invocation, as against Colony, of Dixon's arbitration agreement with Colony—particularly in light of the venue provision in Flaherty's separate Partnership Agreement with Colony.

Finally, it is also relevant that there is no allegation that Colony engaged in the type of inequitable behavior which sometimes gives rise to estoppel, in that Colony did not seek to "simultaneously invoke the duties and obligations of" Dixon's arbitration agreement "while seeking to avoid arbitration."  Kramer v. Toyota Motor Corp., 705 F.3d 1122, 1133 (9th Cir. 2013) ("The 'linchpin' for equitable estoppel is fairness."); Denney, 412 F. Supp. 2d at 298

---

[7]     At the arbitration hearing, Flaherty also testified that Colony hired Dixon pursuant to its obligations under the Partnership Agreement (docket entry no. 59-1 at ECF pages 782-84).

("The purpose of the doctrine of equitable estoppel is to prevent a plaintiff from, in effect, trying to have his cake and eat it too; that is, from rely[ing] on the contract when it works to [his] advantage [by establishing the claim], and repudiat[ing] it when it works to [his] disadvantage [by requiring arbitration]." (citation and internal quotation marks omitted)).

Having considered the parties' relationships and agreements, the indemnification claim asserted by Flaherty, and the totality of the circumstances proffered here, the Court concludes that Colony did not agree to arbitrate the indemnification claim Flaherty asserted against it before JAMS and that the arbitrator therefore lacked authority to issue an award resolving the dispute. The Court will therefore grant Colony's motion to vacate and vacate the Award in its entirety.[8]

---

[8]    The Court therefore declines to reach Colony's other arguments for vacatur, including the distinct but related question of whether the arbitrator had the authority, under Dixon's arbitration agreement and the procedural rules of JAMS, to determine the arbitrability of Flaherty's indemnification claim against Colony. If the Court were to separately address that question, however, it would find—for many of the same reasons explained above— that the arbitrator lacked that authority given the absence of clear and unmistakable evidence that Colony intended to delegate the arbitrability of its dispute(s) with Flaherty to the arbitrator. See Gerszberg, 215 F. Supp. 3d at 287-91 ("'[A]rbitrability questions are presumptively to be decided by the courts,' and this presumption 'can be rebutted only by clear and unmistakable evidence from the arbitration agreement, as construed by the relevant state law, that the parties intended that the question of arbitrability shall be decided by the arbitrator.'" (quoting Telenor Mobile Communications AS v. Storm LLC, 584 F.3d 396, 406 (2d Cir. 2009)); Contec, 398 F.3d at 209 ("In order to decide whether arbitration of arbitrability is appropriate, a court must first determine whether the parties have a sufficient relationship to each other and to the rights created under the agreement. . . . A useful benchmark for relational sufficiency can be found in our estoppel decision in Choctaw[.]").

<u>CONCLUSION</u>

For the reasons discussed above, Colony's motion to vacate the arbitration Award issued against it on August 9, 2021, is granted.  The Award is vacated in its entirety pursuant to 9 U.S.C. section 10(a).

The parties are directed to file a joint letter no later than **July 19, 2022**, setting forth their positions as to what, if any, issues in this action remain outstanding in light of this Memorandum Order, what further proceedings are necessary to resolve any such issues, and whether both parties consent to the adjudication of the merits of any remaining claims by a Magistrate Judge.  As to the matter of consent to adjudication by a Magistrate Judge, the joint letter shall not disclose the parties' individual positions; rather, it must simply state whether both parties consent or not.

This Memorandum Order resolves docket entry no. 48.


SO ORDERED.

Dated: New York, New York
        July 5, 2022


                                        /s/ Laura Taylor Swain
                                        LAURA TAYLOR SWAIN
                                        Chief United States District Judge